Good morning. Bo Sterling for Appellant Jones. Are we ready to proceed? Let your co-counsel get settled there for a minute. I think she's ready. Go ahead. Thank you. As a result of what the magistrate judge determined to be negligence by the Federal Marshals Service, Mr. Jones languished for about four months in the L.A. County Jail. The question here today is, is there any remedy for that, four months that he spent in the jail under the IAD or under the Speedy Trial Act or under the Sixth Amendment to the Constitution? He did get some credit from the sentencing judge, did you know that? That's very true, Your Honor. The sentencing judge essentially gave Mr. Jones an adjustment, downward adjustment to the sentence to an approximate amount of six months for the time that he spent there. That was the judge's resolution. So he did some rough justice. Is that what happened there? That's how I would characterize it as well, Your Honor, yes. Okay. All right.  All right. Now, the reasoning of the magistrate judge, which was adopted by the district court judge, was that there was no detainer in this case, and that's about as far as the analysis went in terms of the Unlawful Detainers Act. What do we do with the fact that he's not a sentenced prisoner and the act doesn't even apply to him? Well, that's the problem, Your Honor, and I'm going to acknowledge that now. The issue down below is fairly simple, and I can address whether or not there was a detainer. We certainly think there was a de facto detainer in this case. However, there are multiple hurdles that would have to be cleared to get a remedy under the act, and certainly whether or not he's a prisoner is one of those. There's prior precedent from the circuit that… Prisoner meaning someone who is serving a term of imprisonment. Right. And he's being held as a pretrial detainee. It's kind of a musical chairs game of which charge are we holding you on today, but the point is he was not serving a sentence of either a California state court or a Nevada federal court while he was incarcerated at the Los Angeles County Jail. No, that's absolutely true, Your Honor, and Reed is the first case to say that. We could argue that that was dicta, but there's subsequent authority as well on that point. I think if you look at Article I of the IAD and you actually look at the purposes that are stated in there, certainly the concerns about getting treatment while in the facility were part of the motivation for the act, but if you look at the actual stated purposes, it goes beyond that and expresses concern about orderly disposition of charges and coordination. So I would say that Reed was incorrect when it did in fact limit the act simply to pre- or when it limited the act only to sentenced prisoners. What was the basis, legal basis, for your client being held as a pretrial detainee in the L.A. County Jail? Well, as the magistrate judge recognized, the record's not entirely clear on that point. However, it appears that he was there on a parole violation under California law and also under a warrant under California law for failure to pay child support. Did, as far as we can tell from the record, was the decision to hold him as a pretrial detainee for whatever length of time related to these charges that we're concerned with here today? It's certainly our position that they were. After April 1st, there don't appear to be any pending California charges. So after April 1st, we would argue he was under a, you know, for all intents and purposes, he was under a sentence of imprisonment in California on charges at all. What happened to the parole hold that he was originally returned to California on? I don't know the answer to that, Your Honor. I'm not sure the record is clear, but perhaps the counsel can clarify that. But as I understood, when he was first arrested in Las Vegas on the gun charge, he was taken, or I guess it would be extradited, to California as a result of the parole violation from California charges? That's what the record reflects. Okay. And then there were some new California charges that arose? There were. And, again, it's not entirely clear from the record, but at some point a California judge lifted whatever hold there was under. Was that the failure to pay child support charge? Is that what that was? That's what it says in the record. I don't understand exactly what that is under California law, but that's what the record reflects. And, again, this is mostly being gleaned by the magistrate judge and the parties from references and documents. There wasn't a hearing to address those issues. So whatever happened, I guess the only way he could have been returned to prison on the parole violation would be if the parole board violated him and then ordered him returned to state prison, right? Well, again, that's not clear. I'm not sure. That's certainly one explanation, or he may have simply been back in jail again serving whatever sentence he was serving before. I'm not sure what the consequence or what the procedure is for that. But your explanation is the most reasonable. I don't think that there is such a thing as parole from a state county jail sentence. I wouldn't think so. But, Your Honor, honestly, I'm not familiar with California law on that one. And, again, that's one hurdle that we'd have to get under is, first of all, whether the IAD even applies to this case. The other hurdles have to do with, you know, what the remedy would be. Aren't we bound by our prior panel decision in Reed? I mean, I know you think it was incorrectly decided. I think that the court probably is. And Ms. Olson, I think, will cite some more recent authority on that point as well. So, yes, this court would have to certainly change at least several of its prior decisions before Mr. Jones would be entitled to a remedy. The other point, obviously, being that he never made a request, which is one of the requirements under the Act as well. And we've argued that that requirement should be forgiven. But the United States Supreme Court, in fact, and as recognized by this Court in Johnson, has said that that remedy is foreclosed, or that analysis is foreclosed. Do you want to save some time for rebuttal? I will, Your Honor. I'm not sure why the Court scheduled it for 15 minutes on each side. If you'd like, I'll address the ---- if you'd like. It's an interesting issue. I mean, you know, we get these things occasionally, and it's an act that we all wrestle with, and we understand the practical problems where you've got folks like Mr. Jones, who, as Judge Goodwin used to say, seem to be doing life on the installment plan. Absolutely, Your Honor. This case screams out for a remedy, and, you know, perhaps under the Sixth Amendment or, again, under the Speedy Trial Act, there's a provision that says that, you know, the government is supposed to take certain steps and is required to do so, but this Court has said that there's no remedy for a violation of that, and that's another precedent that perhaps needs to be reexamined, and we would ask the Court to reexamine it. If the ---- if, as we believe to be the case, if Judge Proe did some rough justice here by, in essence, giving him credit for times, or maybe even a little more credit than the four months that he was complaining about, the remedy that he really wanted was outright dismissal of the Federal gun charge that he's currently incarcerated on. Yes, that's true, Your Honor. We wouldn't be here today if he was happy with the Sixth Amendment. Yeah. So that really does cause us to have to decide whether or not the interstate agreement even applies to his case, and if it doesn't, then sorry, Mr. Jones. Absolutely, Your Honor. I'll reserve the rest of my time. Thank you. Thanks for coming in today. We'll hear from the United States at this time. Good morning. May it please the Court. Elizabeth Olson on behalf of the United States. Good morning, counsel. Do you have a new U.S. attorney down there yet? Not yet. Not yet. We're ---- Do we know who it is? I ---- unless there was something in the paper this morning, I haven't seen. Okay. Go right ahead. First of all, to answer Judge Tamla's question, what appears to have happened, the defendant was arrested in Las Vegas by local police on a kidnapping charge. This whole issue arises out of the defendant had barricaded himself with his girlfriend into the bathroom of the girlfriend's father's home at gunpoint and wouldn't let until the police essentially broke in. But the gun came out of that kidnapping case, didn't it? Yes. Yes. So what happened, my understanding, and again, the records are sketchy, but for a great deal of time through this process below, the defendant was representing himself, which might account for some of that. But in any event, he was arrested by local police on the kidnapping and gun charges. That constituted a violation of his parole in California on his latest ---- And do we know what he was on parole for? He has six prior felonies. I'm not sure which one. I believe ---- I'm sorry. It might be four. Either four or six prior felonies. But he was on parole in California from at least one of those. So that constituted a violation of parole and also constituted the current federal charge. This kind of confusion and chaos often happens in these cases simply because you've got a prior felon who possesses a firearm who's often discovered possessing a firearm because he's committing a new crime, which is also a parole violation. So this isn't a terribly uncommon thing. He was removed. He was transferred back to California on the parole violation in December 2004. Why? I'm sorry? Why? Why the Las Vegas police or why the Las Vegas State or, I'm sorry, Nevada State Courts transferred him to California. I don't know exactly. I think ---- No, I don't know. I know that he was transferred to California on the parole violation from Nevada. I don't believe there's anything in the record to explain why Nevada gave him up. And when was the Federal indictment returned? The Federal indictment was returned in late December 2004. So was he transferred before the indictment? Before. He was then released from the California on that initial parole violation in January 2005. Now, whether we knew that that's where he was or whether they knew that there was a Federal indictment, we don't know. And like I say, I mean, we certainly acknowledge that there's confusion about how this all happened. But in any event, California released him in January, and then they rearrested him on this state charge for failure to pay child support in February. And at that point, the booking document, which is in the record, shows that on the printed booking form, it shows that he was being booked for this child support violation. And then handwritten in was this Federal ---- was the existence of this Federal charge against him. And at that point, had the Bureau of, what's it called now, Alcohol, Tobacco, and Explosives? Or Firearms and Explosives. Let's just call it ATF for those of us old-timers. ATF had faxed a copy of the Federal gun charge indictment to the L.A. County Jail? That happened a little bit later. From what we can gather from the documents, from the booking document, which is on the booking document, I believe it's on ER 45, he was arrested at about a little before midnight on February 2nd, was booked into the jail a little bit before 2 a.m. At about 4 a.m. or a little bit before 4 a.m. that next day, there's a fax from ATF to the jail, faxing a copy of the Federal arrest warrant. Now, what the district court didn't have in front of it, but what you have, or if you choose to take notice of these additional documents that the defendant has asked you to take notice of, is at 6 o'clock the next morning, there's an inter what appears to be an inter-jail communication from someone in the jail to somebody else in the jail saying put a hold on this defendant or put a hold on this detainee for this Federal charge. Contact the U.S. Marshals for the detainer. Okay? So I think we can infer from that that at least the officials in the jail didn't consider the faxed arrest warrant a detainer because they already had it and they were saying we need to get a detainer. But this is really speculation, and maybe I shouldn't even ask the question, but in my experience, I have seen that notation added on the basis of a phone call. The ATF agent could have called, somehow learning that this guy was now out and about again, and called the jail and said, look, he's been indicted in Las Vegas, and the jail's response would typically be, well, confirm the warrant. And so then a fax of the warrant gets sent. But the problem I'm having with this whole line of questioning is, A, that this evidence was not before the district court at the time it ruled. B, I don't think it's a proper subject for judicial notice because it's not authenticated. I couldn't tell from the fax top of the page whether the jail even got this stuff. And I don't know what exactly these documents. I believe that the district court did have a copy of that fax that the defendant had apparently gotten from the jail. So I don't think that we are disputing that ATF or I'm sorry, we are not disputing that ATF faxed a copy of the warrant to the jail. But, you know, to engage in speculation, which is clearly speculation, but no more so than the defendant was asking the court to engage in, it could also be that as routine booking procedures, when the jail books somebody in and sees that there are additional warrants out, they call the agency and say, can you fax us a copy of the warrant just to make sure that the paperwork is complete? We don't know. And to make sure the warrant hasn't been recalled. Yes. In any event, the jail then said, you know, there's this inner email saying we need to get a detainer from the marshals, and the marshals never lodged a detainer. There's no question about that. When did this barricade incident occur? In October of 2004. You got a date? October 31st, he was arrested. That's on page 9 of the excerpt of record. He was arrested October 34th. October 30 what? October 31st, 2004. And what was he charged with? In Las Vegas, I believe the charge was kidnapping and illegal possession of a firearm. And these were State charges. State charges, yes. And he was in the Clark County Jail? I assume so, yes. Yes. Yes, he was. On State charges. When did the Federal felon and possession charges first raise their head? That was in late December 2004, after he had been transferred to California. Okay. Okay. All right. Okay. Clearly, as defense counsel acknowledged, the interstate agreement on detainers has three required criteria. First, that the defendant be a prisoner serving a period of incarceration. Second, that a detainer is lodged. The district court made an explicit finding of fact that no detainer was lodged, and that certainly can't be considered clearly erroneous. And third, even when those two criteria are met, the specific right that the IAD confers is the right to have the outstanding charges determined within 180 days of the date on which the U.S. Attorney's Office in Nevada and the U.S. District Court in Nevada receive the defendant's written request for resolution of the charges. There was never a written request for resolution of the charges, so that clock simply doesn't start to tick. At some point, did the State of Nevada dismiss its charges arising out of the barricade incident? I believe that it did. I'm sorry I don't have the citation, but I believe the PSR notes that those charges were dropped in favor, in light of the federal indictment against the defendant. But I'm not sure when that happened. I believe the notation that I saw was in the pre-sentence report on the probation office's discussion of that charge. It's interesting that between the State and federal authorities, they thought felon in possession was a better charge to proceed on than armed kidnapping. Yeah. And this, obviously, this is not in the record. In preparation for this argument, obviously, I talked to the AUSA who prosecuted the ATF case agent and the deputy marshal who testified at the hearing. And I believe, I mean, this was a long time ago, and recollections are fuzzy as well as documentation being sparse. I believe one of the victims, perhaps the victim or maybe the father, the witness, somebody moved to Guam. And so I think that the State would have had a hard time prosecuting that. There was a reason. I believe that they had a reason to just turn it over to the feds and let us prosecute it as the felon. Well, maybe you can, next time you do a training exercise for federal agents, maybe you could go through this case and point out the problems and pitfalls and pratfalls. Absolutely. And as I say, I have talked to all the parties involved. I think that initially, you know, up until, you know, when the last parole hold in March was lifted, March 05, and the jail communicated with the marshal's office and with the ATF that, you know, we're done with this guy. The U.S. Attorney's Office filed a writ, a petition for a writ, and the marshals attempted to pick up the defendant on the writ on April 1st, and the L.A. County jail folks wouldn't turn him over. They said that they weren't done with him yet. That seems from the information that we have to be incorrect because it doesn't appear from the information that we have that there were any further pending state charges on him. But regardless, after the L.A. jail refused to turn over the defendant on April 1st, you know, either everybody thought, okay, well, we'll just wait until they're done and they'll let us know, or everybody thought, well, somebody else will follow up on this. You know, I mean, you have ATF, you have the marshal's office, you have the U.S. Attorney's Office. And, you know, what the district court found is that after April 1st, there was negligence on the part of the government, but that that negligence essentially was a lack of diligence. There was no bad faith. There was no intentional effort to keep him in prison. And then when the jail, again, the next week, no from the jail is June 2nd when they said we're done with this guy. ATF eventually picked him up on July 19th. So there's another six-week period. As Judge Talman acknowledged, although the IAD does not provide a remedy and the Speedy Trial Act does not provide a remedy, at the defendant's sentencing, Judge Pro did, you know, exercise the discretion that he had to make things right in a rough justice sort of way. Okay. All right. Thanks for coming in this morning. Any rebuttal? Nothing specific, Your Honor. Your suggestion that this might be a good teaching tool is a good one. It reminds me of the Chinese proverb, may you live in interesting times, which I think is also a curse. You know, Danny Jones obviously, you know, suffered at the hands of government negligence in this case. We would hope that the court would reach out and provide him some remedy beyond that already provided by the district court. Okay. My favorite proverb was always, may you have a lawsuit with a valid defense. Thank you both for coming in today. The case just argued will be submitted for decision.
judges: Hug, Hawkins, Tallman